

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00124-CV

_____

IN THE INTEREST OF D.S., D.S., D.S., AND D.B., CHILDREN

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-736145-23

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant B.B. (Mother) appeals the termination of her parental rights to D.S. (Daniel),[2] D.S. (Damian), D.S. (Dana), and D.B. (David) (collectively, the children). The trial court found by clear and convincing evidence that Mother had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that had endangered their physical or emotional well-being, (2) engaged in conduct or knowingly placed the children with persons who had engaged in conduct that had endangered their physical or emotional well-being, (3) constructively abandoned the children, and (4) failed to comply with her court-ordered service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O). The trial court also found that termination of the parent–child relationship between Mother and the children was in their best interest. *See id.* § 161.001(b)(2).

In three issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's endangerment and best-interest findings. Because sufficient evidence supports the endangerment findings and the best-interest finding, we affirm.

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights).

## II.  Background

An investigator with Child Protective Investigations testified that the agency had received a report in late April 2024 regarding neglectful supervision and medical neglect of the children.  Concerns were expressed regarding Mother's leaving her children—all four between the ages of eleven months and four years—unattended and not taking two of her children—one who had autism[3] and another who had extreme eczema—to the doctor.

The investigator met with Mother on April 25, 2024, at Grandmother's house and told her that there were concerns about the children's safety—"living in the household with [Grandmother], who [had] just had surgery[ and who acted as the children's] caretaker when [Mother] was away at hours of the night."  Mother explained that she had left at night to avoid getting into verbal altercations with Grandmother.  Mother further stated that when she had left the house to avoid the altercations, she had gone to the front yard to watch items on the lawn—the children's clothes and toys.

Mother told the investigator that the fathers of the four children were not involved in their lives and that they did not pay child support.

The investigator talked to Mother about Family-Based Safety Services (FBSS) that would help her look for a job and that would provide therapy and other resources.

---

[3]The record demonstrated that Daniel was on the autism spectrum and that Mother had chosen not to take him in for a full evaluation.

Although Mother had been part of an FBSS case in the past on more than one occasion, she declined FBSS when the investigator offered.

Based on information from Mother's prior FBSS cases, the investigator had concerns about Mother's drug use and asked her to take a drug test. Mother declined to take a drug test on that day.

The investigator testified that Mother had told her that she had spent "three-plus years" in prison in 2010 for aggravated assault with a deadly weapon. This occurred ten years before Mother's first child was born.

On May 11, 2024, the investigator went back to Grandmother's home and attempted to convince Mother to accept FBSS. When the investigator arrived, she overheard Mother and Grandmother arguing about whether the investigator could enter the home; Grandmother was in favor, but Mother was not. The investigator testified, "[I]f there was no safety concern, there would be no reason that I couldn't enter the home." Because the investigator was concerned about the way that Mother and Grandmother communicated with one another in front of the children, the investigator offered a family team meeting for them to try to come up with a solution for how to make things better.

In the interim, the investigator concluded that it was important for Mother and the children to move out of Grandmother's home. The investigator offered Mother options for shelters, but Mother was nervous about living at a homeless shelter and offered to go to a hotel. Mother and the children did not, however, go to a hotel.

Three days later, the investigator went back to Grandmother's home because Adult Protective Services reported that she was getting evicted. When the investigator arrived, Mother was not there to stop her from entering the home. Upon entering, the investigator noted that the home smelled like feces and that trash, laundry, and household items were stacked up to the ceiling. The investigator said that "[i]t was a situation that [she] felt was unsafe for both adults and children."

The investigator observed that David, the baby, was wearing a diaper that "was extremely full and leaking" and that the other children were not clothed properly. Grandmother said that she did not have diapers or clothes for the children. The investigator conducted an emergency removal of the children on that day because she could not reach Mother, because Grandmother said that she could not care or provide for the children, because "the home was not a safe environment for children to live in," and because no other family members could be found who were willing to take the children.

That evening, after the children had been removed, Mother called the investigator and asked when she could pick up her children. The investigator asked where Mother had been, and she said that she had been cleaning houses, that her phone had died, and that she could not get a ride home. Alternatively, Mother said that she and Grandmother had argued, that Grandmother had broken glass all over the home,[4]

---

[4]The investigator did not see broken glass.

and that Mother had left. The investigator was concerned that Mother had been gone from her children for approximately fifteen hours.

Mother met with the investigator at the CPS office later that night; she arrived with a man, who she claimed was her boss and who stayed outside in a truck. The investigator noted that Mother appeared to have bruises all over her body. The investigator saw what looked like needle-puncture bruises and had concerns about drug use. The investigator asked Mother about the bruises, but she did not agree to talk about them. When asked to take a drug test, Mother declined. Mother said that she had drug tested in September 2023 and that she would not test again.

Throughout the investigation, the investigator was concerned about Mother and Grandmother's turbulent and potentially violent relationship. The investigator concluded that there was reason-to-believe for neglectful supervision of the children by Mother because she had left the children in a home with an adult who could not protect them or provide for their safety.

The initial permanency specialist who handled the case from late May 2024 until mid-October 2024 testified that when she conducted a family strength and needs assessment with Mother on May 28, 2024, Mother said that she was going to be looking into a homeless shelter because she and Grandmother were being evicted from their home. Mother described her relationship with Grandmother as combative, irritable, and aggressive. Mother also mentioned that she had suffered intimate-partner violence

6

from Daniel and Dana's father on numerous occasions and that she had a protective order against another man who was not the father of any of her children.

During that assessment, Mother admitted that she had smoked marijuana since she was fifteen and that the last time she had smoked marijuana was the day before the show-cause hearing. The initial permanency specialist opined that Mother's drug use was concerning because all of the children were under four years old and would not be properly supervised if Mother were under the influence. When the initial permanency specialist asked Mother to submit to a drug test, Mother said that it was none of the Department's business what drugs she was using because the children had been removed from her care, and thus she was not supervising them. In total, the initial permanency specialist asked Mother to drug test on six dates, and Mother refused all six.[5] The initial permanency specialist opined that Mother's refusal to test was because she was using controlled substances.

Mother also reported during the assessment that she had been diagnosed with post-traumatic stress disorder, anxiety, and depression, but she was not taking medication. The initial permanency specialist testified that this was concerning because the children were young and were not able to care for themselves. The initial permanency specialist further testified that Mother "was leaving the home with [the

---

[5]Mother was made aware during the May 28, 2024 assessment that her failure to take a drug test would be a presumed positive drug test.

7

children] unattended, so it would be best for them [for her] to address her mental health."

Mother received a copy of the service plan that the initial permanency specialist prepared, and the plan was made an order of the court. Mother, however, did not complete any of the services on the plan. Of the twenty-one visits that Mother was allowed from late May to mid-October 2024, she attended only seven.[6] And during the visits that Mother attended, the initial permanency specialist had to purchase food and drinks for the children because Mother was unable to provide for her children.[7]

According to the initial permanency specialist, Mother did not demonstrate that she could provide the children with a safe and stable home. The initial permanency specialist explained that while she oversaw the case, Mother was homeless and only sometimes stayed in a hotel. And because Mother did not have money to pay for a hotel room, she was arrested for criminal trespassing for not paying her hotel bills.[8]

---

[6]Due to Mother's no-showing for visits, the Department instituted a rule that Mother had to message the initial permanency specialist twenty-four hours before a scheduled visit before the Department would transport the children. The initial permanency specialist confirmed that due to Mother's failure to communicate with the Department, visits were temporarily suspended pending her reconnecting with the Department.

[7]Mother's service plan from June 2024 stated that she received food stamps in the amount of $1,100 per month, as well as WIC and Medicaid.

[8]Mother's service plan noted that Mother was unemployed but that she had cleaned houses "here and there" since March 2024 and made $100 per job.

Mother's criminal case was dismissed in August 2024 after she was ordered to go to the mental-health jail diversion center where she spent one day.

The latter permanency specialist[9] provided a status update on the children. She testified that Dana and David had been placed together in a foster home in Canton. The latter permanency specialist said that "[t]hey have been doing very well. . . . They are adjusting well to foster mom and foster dad. They have grown a very strong bond to them. They call them 'Mom' and 'Dad,' as well as a strong relationship there with their biological siblings." The latter permanency specialist said that Dana and David were receiving speech therapy and that David was also receiving physical therapy due to "his bowleggedness." The foster parents were not willing to adopt but were willing to keep the two children until they could be placed in an adoption-motivated home.

Damian was living in a single-parent foster home in Fort Worth and was receiving one-on-one attention. According to the latter permanency specialist, Damian was doing very well, was going to be starting play therapy to help with emotion regulation, and had a strong connection with foster mother. His foster mother was noted as being adoption motivated but was not able to adopt Damian's three siblings.

Daniel was living with two foster fathers. Per the latter permanency specialist, Daniel was nonverbal but had shown tremendous improvement. The foster fathers

_____

[9]There was a permanency specialist who oversaw the case between the initial permanency specialist and the latter permanency specialist; the intervening permanency specialist did not testify.

9

were not adoption motivated but were willing to keep Daniel long term to ensure that he got his "autism diagnostic taken care of and that he's able to complete his play therapy to help with his emotions."

The latter permanency specialist noted that the Department's intake team was actively looking for an adoption-motivated home that would accept all four children, but none had been found as of the termination trial. The hope was to unify the children.

On February 11, 2025, the latter permanency specialist received a call from Mother, who had not been in contact with her and who had not responded to any emails, phone calls, or text messages from her. Mother said that she had previously been homeless but was staying at the SafeHaven shelter in Arlington. The latter permanency specialist tried to engage Mother in a conversation about marijuana and methamphetamine use, but Mother said to talk to her case manager at SafeHaven.[10] After the call, Mother was arrested on February 14 and stayed in jail until February 20 for criminal trespass.

The latter permanency specialist testified that as of the March 10, 2025 termination trial, Mother had not completed any services on her service plan. Mother also had neither visited the children from December 2024 to the termination trial nor asked about their well-being. Mother never took a drug test during the case, so all

---

[10]The latter permanency specialist received no response to her email to SafeHaven inquiring about Mother's drug use.

twelve monthly drug tests were presumed positive. Mother also failed to keep in communication with the Department and to provide updated contact information.[11]

According to the latter permanency specialist, Mother had not demonstrated that she can provide her four children with a safe and stable home. She elaborated that Mother's stability was uncertain as of the termination trial and that Mother was possibly continuing drug use. Mother had not been able to meet her own basic needs or those of her children. The latter permanency specialist opined that "there's [a] possible risk for harm and danger now and in the future" and that termination of Mother's parental rights would be in the children's best interest. The children's ad litem also recommended termination of Mother's parental rights.

After hearing the above evidence, the trial court terminated Mother's parental rights based on endangering environment, endangering conduct, constructive abandonment, and failure to comply with her court-ordered service plan, as well as best interest. *See id.* § 161.001(b)(1)(D), (E), (N), (O), (b)(2). Mother then perfected this appeal.

### III. Sufficient Evidence Supports the Endangerment and Best-Interest Findings

In her three issues, Mother challenges the sufficiency of the evidence to support the endangering-environment, endangering-conduct, and best-interest findings. We set

---

[11]Mother's service plan was admitted into evidence during the termination trial, and it required Mother to maintain contact with her permanency specialist on a weekly basis.

forth the burden of proof and the standards of review and then address the endangerment findings and best-interest finding in turn, ultimately holding that sufficient evidence supports all three findings.

### A. Burden of Proof and Standards of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable

factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Moreover, evidence is not legally insufficient merely due to inconsistencies or disputes in the evidence, and "a holistic review of the evidence" should be performed. *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that Mother's conduct had endangered Daniel, Damian, Dana, and David[12] and had created an endangering environment for them and that the termination

---

[12]The Department contends that Mother's sufficiency challenges to the endangerment findings are not properly before this court. Specifically, the Department argues that because Mother does not challenge the predicate findings under Section 161.001(b)(1)(N) and (O), "she has waived appellate review as to the legal sufficiency of the underlying predicate grounds. We disagree. The San Antonio Court of Appeals has succinctly explained how the general rule promoted by the Department does not apply when the endangerment findings are challenged:

> To be successful on appeal, an appellant must challenge all the predicate grounds upon which a trial court based its termination order. *In re S.J.R.-Z.*, 537 S.W.3d [677,] 682[ (Tex. App.—San Antonio 2017, pet. denied) (op. on reh'g)]. When an appellant does not challenge all the grounds that may support an order of termination, we typically do not address the sufficiency of the evidence of any of the predicate grounds for

13

of the parent–child relationship would be in their best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. Endangerment Findings

In her first and second issues, Mother argues that the evidence is legally and factually insufficient to support the jury's endangerment findings under Subsections (D) and (E) of Texas Family Code Section 161.001(b)(1). Applying the standards of review

---

termination. *See In re A.V.*, 113 S.W.3d [355,] 361–62[ (Tex. 2003)]; . . . *S.J.R.-Z.*, 537 S.W.3d at 682. Instead, we must accept the validity of the unchallenged grounds and affirm the termination order. *See . . . A.V.*, 113 S.W.3d at 361–62; . . . *S.J.R.-Z.*, 537 S.W.3d at 682.

However, because termination under [S]ubsection 161.001(b)(1)(D) or (E) may have implications for a parent's parental rights to other children, [*see* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (allowing a trial court to terminate the parental rights of a parent whose parent–child relationship with another child was terminated based on an endangerment finding under (D) or (E) or an out-of-state-equivalent),] appellate courts are instructed to address issues challenging a trial court's findings under those subsections. *In re N.G.*, 577 S.W.3d 230, 23[5]–37 (Tex. 2019). Therefore, we will consider [m]other's sufficiency argument as to [S]ubsections (D) and (E) even though she does not challenge termination under [S]ubsections (O) (failure to comply with the provisions of a court-ordered service plan) and (P) (use of a controlled substance in a manner that endangers health or safety of the child).

*In re Q.M.-K.*, No. 04-24-00150-CV, 2024 WL 3681022, at *2 (Tex. App.—San Antonio Aug. 7, 2024, no pet.) (mem. op.); *see also In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (relying on *N.G.* and holding same).

set forth above, we hold that both legally and factually sufficient evidence supports the endangerment findings.

### 1. Applicable Law

This court has previously set forth the law on endangerment findings and has demonstrated how a parent's conduct may be considered within an endangering-environment analysis under Subsection (D):

> Subsections (D) and (E) both require a finding of endangerment. "'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re J.V.*, No. 02-15-00036-CV, 2015 WL 4148500, at *3 (Tex. App.—Fort Worth July 9, 2015, no pet.) (mem. op.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards."). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. [*Boyd*], 727 S.W.2d at 533.
>
> Endangerment under Subsection (D) arises from the child's environment, but a parent's conduct can contribute to an endangering environment. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.*; *see J.V.*, 2015 WL 4148500, at *3 ("Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under [S]ection 161.001(b)(1)(D).")... Subsection (D) permits termination based upon a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

*In re B.U.*, No. 02-23-00150-CV, 2023 WL 5967604, at *3 (Tex. App.—Fort Worth Sept. 14, 2023, pet. denied) (mem. op.).

15

Conduct-based endangerment under Subsection (E) requires more than a "single act or omission"; it requires a "voluntary, deliberate, and conscious course of conduct." *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). As a course of conduct, endangerment under Subsection (E) "is not limited to actions directed towards the child," *J.F.-G.*, 627 S.W.3d at 315 n.43 (quoting *J.O.A.*, 283 S.W.3d at 345), and may include "actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *See In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.). It is not necessary to establish that a parent intended to endanger a child to support termination under Subsection (E). *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). Nor is it necessary to establish that the parent's conduct caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *In re R.R.A.*, 687 S.W.3d 269, 277–78 (Tex. 2024); *see also In re N.L.S.*, No. 23-0965, 2025 WL 1687924, at * 3 (Tex. June 13, 2025).

As we have noted in a prior opinion,

> As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See* [*In re*] *S.D.*, 980 S.W.2d [758,] 763[ (Tex. App.—San Antonio 1998, pet. denied)]. A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.).

16

*In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.).

We catalog a nonexclusive list of the types of conduct that can be considered in an endangering-conduct analysis because they pose a danger to a child's emotional or physical well-being:

- A parent's illegal drug use that exposes her child to the possibility the parent may be impaired or imprisoned. *See J.O.A.*, 283 S.W.3d at 345 & n.4.

- A parent's untreated mental health issues. *In re J.P.-L.*, 592 S.W.3d 559, 583 n.26 (Tex. App.—Fort Worth 2019, pet. denied).

- A parent's failure to complete a service plan, to attend parent–child visits, and to cooperate with the Department. *See In re G.G.-H.*, No. 05-23-00437-CV, 2023 WL 6225410, at *2 (Tex. App.—Dallas Sept. 22, 2023, no pet.) (mem. op.); *In re A.R.M.*, 593 S.W.3d 358, 371 (Tex. App.—Dallas 2018, pet. denied) (mem. op. on reh'g).

- A parent's lack of significant contact with a child. *In re A.J.D.*, No. 02-13-00183-CV, 2013 WL 5781478, at *4 (Tex. App.—Fort Worth Oct. 24, 2013, no pet.) (mem. op.).

### 2. Analysis

The record demonstrates that Mother had a continuing course of conduct that endangered her children and that her conduct created an endangering environment for her children:

- Mother refused to take any of the twelve requested drug tests during the case despite being warned in her service plan that "results will be considered a presumed positive," meaning that all controlled substances that were tested—not just marijuana—would be presumed positive.

17

Mother also told the initial permanency specialist that it was none of the Department's business what drugs she was using.

- Mother had several diagnosed mental-health conditions, but she was not taking medication for them. Mother's mental health was not stable as demonstrated by her decision to leave all four children under the age of four with Grandmother who had recently undergone surgery and was unable to care for the children. The record revealed that Mother left her children with Grandmother at night while Mother watched the children's clothes and toys in the yard. Mother also left the children with Grandmother for approximately fifteen hours while she was allegedly cleaning homes but later said that she had left the house (as well as her children) because she and Grandmother had argued.

- Mother did not work any of the services on her service plan.

- Mother and Grandmother had a volatile relationship to which the children were exposed.

- Mother had been arrested twice for criminal trespass while the children were in the Department's care and had spent several days in jail during the month preceding the termination trial.

- Mother attended only seven visits with the children, did not attend any visits during the three months before trial, and never asked about their well-being.

- Mother failed to keep in contact with the Department while the latter permanency specialist handled the case.

- Mother had a history of homelessness and had not shown the ability to provide safe, stable housing.

In addition to Mother's conduct, which created an endangering environment for her children, the condition of the home that Mother shared with Grandmother at the time of the children's removal "was unsafe for both adults and children."

18

Mother argues that the evidence is insufficient to support the endangerment grounds "as the majority of [the] evidence offered by the Department was simply reflective of [her] economic disadvantage." Mother follows that statement with "[t]he reasons for removal given by the investigator"[13] and spends several pages attacking the listed reasons. To terminate a parent's rights, the Department is not charged with proving up the reasons given by an investigator but instead must prove by clear and convincing evidence one of the predicate grounds listed in Section 161.001(b)(1), as well as that termination is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *Z.N.*, 602 S.W.3d at 545. Mother's argument fails to acknowledge the non-economic evidence that is set forth within the preceding bulleted list, including Mother's refusal to take requested drug tests, her untreated mental-health issues, her pattern of leaving her children with someone who was unable to care for them, her failure to work her service plan and to visit her children, and her volatile relationship with Grandmother with whom she and her children lived.

Applying the standards of review set forth above, we hold that the evidence is legally and factually sufficient to support the endangerment findings under Subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re K.J.*, No. 02-25-00093-CV, 2025 WL 1600219, at *4–7 (Tex. App.—Fort Worth June 5, 2025, no pet.

---

[13]As noted above and as stated in Mother's brief, "The reasons for removal given by the investigator were [that] (1) . . . they could not reach Mother, (2) Grandmother told them that she could not provide for the children, (3) no other family members were able to take the children, and (4) the home was not safe."

19

h.) (mem. op.) (holding evidence legally and factually sufficient to support the endangerment grounds when the record showed, among other things, parents' drug use, unaddressed mental-health issues, failure to provide stability, and failure to cooperate with the Department). We overrule Mother's first and second issues.

### C.    Best-Interest Finding

In her third issue, Mother challenges the sufficiency of the evidence to support the best-interest finding. After weighing the best-interest factors, as set forth below, we conclude that the finding is supported by legally and factually sufficient evidence.

#### 1.    The Law on Best Interest

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)    the [child's] desires . . . ;

(B)     the [child's] emotional and physical needs[,] . . . now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## 2. Analysis

### a. The Children's Desires

When a child is too young to express his desires, the factfinder may consider that the child has bonded with the caregiver, is well cared for by them, and has spent minimal time with a parent. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Here, the record demonstrates that the children had a strong connection to or were bonded with their respective foster parents and that they were being well cared for. The record also demonstrates that Mother had visited the children only seven times while the initial permanency specialist handled the case and that Mother did not visit the children at all from December 2024 through March 10, 2025, when the termination trial was held. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

### b. The Children's Emotional and Physical Needs and the Danger to the Children

The children's physical needs included basic necessities like food; clothing; and safe, stable housing. Mother had been unable to provide housing stability for the children and had not demonstrated the ability to provide food, clothing, or diapers. Additionally, as described in the endangerment analysis, Mother had exposed the children to her volatile relationship with Grandmother and to a home that was unsafe for children. The record revealed that Dana and David needed speech therapy, that David also needed physical therapy due to "his bowleggedness," that Damian and

Daniel needed play therapy to help with emotion regulation, and that Daniel needed additional evaluations due to his nonverbal issues and autism diagnosis. There was no evidence that Mother would be able to take the children to all their appointments when she did not even visit them regularly while they were in the Department's care. The trial court was entitled to find that these two factors weighed in favor of termination of Mother's parental rights to the children.

### c. Parenting Abilities, Acts and Omissions Suggesting an Improper Relationship, and Available Programs

As detailed in the endangerment analysis, Mother's poor parenting decisions—as exemplified by her leaving all four children with Grandmother, who was unable to care for them; her refusing all drug tests; and her deciding not to take medication for her diagnosed mental-health conditions—constitute acts and omissions that indicate that the existing parent–child relationship is an improper one. Furthermore, Mother failed to take advantage of any of the services that she was offered. The trial court was entitled to find that these three factors weighed in favor of termination of Mother's parental rights to the children.

### d. Plans for the Children and Stability of Proposed Home

As of the termination trial, the Department had not been able to find an adoption-motivated home that would take all four children, but the Department was actively looking for an adoption-motivated home that would accept all four children because the plan was to unify the children. The stability of the Department's proposed

23

home for the children thus remained in question. Mother's whereabouts at the time of the termination trial were unknown, as was her plan for the children if they were returned to her care. The trial court was entitled to find that these two factors weighed slightly in favor of termination.

### e. Excuses

The record does not reveal any explanation or excuses for Mother's conduct or her failure to work her services. The trial court was entitled to find that this factor was neutral.

### f. Sufficient Evidence of Best-Interest Factors

As Mother did with her challenges to the endangerment findings, she contends within her best-interest argument that "evidence of [her] being economically disadvantaged does not constitute clear and convincing evidence to support termination." And as we concluded regarding the endangerment findings, the trial court's best-interest finding can be supported by non-economic evidence, including Mother's refusal to take drug tests; her failure to address her mental-health issues; her pattern of leaving her children with someone who was unable to care for them; her failure to take advantage of the services that she was offered; her failure to visit her children; and her volatile relationship with Grandmother, with whom she and her children lived.

Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the finding that termination of Mother's parental

24

rights to the children is in their best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *K.J.*, 2025 WL 1600219, at *8–10 (holding evidence legally and factually sufficient to support the best-interest finding based on, among other things, mother's failure to stop using illegal drugs, inability to maintain stable income and housing, failure to complete her services, and failure to visit); *In re A.V.*, No. 11-23-00144-CV, 2023 WL 8631492, at *8 (Tex. App.—Eastland Dec. 14, 2023, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support the best-interest finding based on, among other things, mother's lack of parental abilities, history of drug abuse, and her inability to provide a safe and stable environment); *Jordan*, 325 S.W.3d at 733 (holding evidence legally and factually sufficient to support the best-interest finding when most of the best-interest factors weighed in favor of termination). We overrule Mother's third issue.

## IV. Conclusion

Having overruled Mother's three issues, we affirm the trial court's order terminating Mother's parental rights to Daniel, Damian, Dana, and David.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: June 19, 2025

25